2022 IL App (1st) 210892

SIXTH DIVISION
October 28, 2022

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-21-0892

| | | |
|---|---|---|
| MARGARET AGWOMOH, Special Administrator of the Estate of Solomon Agwomoh, Deceased, | ) ) ) | |
| Plaintiff-Appellant, | ) ) | Appeal from the Circuit Court of |
| v. | ) ) | Cook County. |
| THE VILLAGE OF DOLTON; RYAN PEREZ; ADVOCATE HEALTH AND HOSPITALS CORPORATION, d/b/a Advocate Christ Medical Center; and YALAUNDA THOMAS, M.D., | ) ) ) ) | No. 18 L 2677 Honorable Lorna E. Propes, |
| Defendants | ) ) | Judge Presiding. |
| (The Village of Dolton and Ryan Perez, Defendants-Appellees). | ) ) | |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Oden Johnson and Tailor concurred in the judgment and opinion.

**OPINION**

¶ 1    Solomon Agwomoh died minutes after a physical altercation with Ryan Perez, a police officer for the Village of Dolton. The altercation happened in the early hours of March 10, 2018, at Advocate Christ Medical Center in Oak Lawn. Mr. Agwomoh's daughter, Margaret Agwomoh, in her capacity as special administrator of his estate, sued Officer Perez, the Village, the hospital, and one of its doctors for the wrongful death of her father.

¶ 2    After extensive discovery, the Village of Dolton and Officer Perez moved for summary judgment as to them, arguing that, because "Officer Perez was providing a police protection service at the time and place alleged in the complaint," he was entitled to absolute immunity from civil suit as a matter of law pursuant to section 4-102 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act or Act) (745 ILCS 10/4-102 (West 2020)). In the alternative, these defendants argued that they were also entitled to immunity under section 2-202 of the Act (*id.* § 2-202), because Ms. Agwomoh failed to show that Officer Perez's use of force "in responding to decedent's dangerous, destructive, and violent use of force was both without legal justification and willful and wanton conduct."

¶ 3    Ms. Agwomoh argued in response that whether Officer Perez was "dispatched to provide a police protection or service under Section 4-102" and whether he committed willful and wanton misconduct under section 2-202 were both questions for the trier of fact. The circuit court entered summary judgment in favor of the Village of Dolton and Officer Perez, concluding that, as a matter of law, they were entitled to immunity from civil suit under both sections 4-102 and 2-202. Ms. Agwomoh now appeals.

¶ 4    Ms. Agwomoh argues that the circuit court's application of section 4-102 was erroneous because that provision grants absolute immunity only where a plaintiff alleges a *failure* to provide police services, which is not what she alleged in this case. She also argues that section 2-202 was erroneously applied because genuine issues of material fact remain on the question of whether Officer Perez's conduct in the moments leading up to her father's death was willful and wanton.

¶ 5    We agree with Ms. Agwomoh that neither section 4-102 nor section 2-202 provides immunity to Officer Perez and the Village of Dolton as a matter of law. These defendants were not entitled to summary judgment under section 4-102 because Officer Perez was present at the

hospital to maintain custody of an arrestee and there was no undisputed evidence that he had pivoted from his law enforcement role to providing police protection services. In addition, for section 4-102 to apply the liability alleged must come from the *failure* to provide police protection services. Summary judgment was inappropriate under section 2-202 because whether Officer Perez engaged in willful and wanton misconduct presents a question of fact that ought to go to a jury. For these reasons, we reverse the circuit court's grant of summary judgment in favor of the Village of Dolton and Officer Perez, and we remand for further proceedings.

¶ 6                                I. BACKGROUND

¶ 7     The following facts are taken from the exhibits and depositions attached to the parties' summary judgment filings in the circuit court.

¶ 8                              A. The Traffic Accident

¶ 9     At 12:38 a.m. on March 10, 2018, police received a 911 call reporting a car crash with injuries at the intersection of Sibley Boulevard and Cottage Grove Avenue in Dolton, Illinois. Responding to the scene within minutes, Dolton police officers encountered two vehicles that had sustained "tremendous" damage, and they called for an ambulance. The driver of one of the cars was shaken but able to communicate with officers and did not appear to have sustained any obvious injuries. The driver of the other vehicle, Solomon Agwomoh, was in worse shape.

¶ 10    When officers first approached Mr. Agwomoh's vehicle, a red Ford Escape operating as a taxicab for "Chicago Elite Cab," he was unresponsive and appeared to be unconscious. The vehicle's air bags had deployed. One of the responding officers, Officer Vincent Nunez, loudly asked Mr. Agwomoh if he could hear his voice, at which point Mr. Agwomoh came to and immediately hunched over and vomited into the passenger seat of his vehicle. Officers then attempted to ask Mr. Agwomoh what he remembered before the collision and Mr. Agwomoh,

speaking in what was described by Officer Nunez as "a heavy African accent," stated "I don't know! He just hit me."

¶ 11    Officer Ryan Perez, another Dolton police officer present at the scene, peered into Mr. Agwomoh's vehicle and saw a plastic cup on the floor containing the residue of a dark-colored liquid that, according to Officer Perez, smelled of alcohol. This caused Officer Perez to suspect that Mr. Agwomoh was under the influence. His suspicion grew when paramedics arrived. As Mr. Agwomoh was being loaded into the ambulance, Officer Perez described his demeanor as disoriented and recalled that he was "having a hard time" answering the paramedics' questions. He also noticed that Mr. Agwomoh's eyes were bloodshot, and he detected a "strong odor of alcohol" coming off of him.

¶ 12    A Dolton police sergeant who was also present at the scene, Sergeant Johnson (whose first name does not appear in the record), surmised that Mr. Agwomoh "appeared to be intoxicated." No field sobriety test was conducted, however, as Mr. Agwomoh had been placed in a cervical collar or "c-collar" by paramedics and his "health was a concern at that point." Sergeant Johnson instructed Officer Perez to follow Mr. Agwomoh to the hospital and process him for suspected driving under the influence (DUI).

¶ 13    Janell Krueger, the lead paramedic on the ambulance team that transported Mr. Agwomoh to the hospital, also suspected that he might have been under the influence. In her deposition, she recalled noticing "some kind of scent, maybe alcohol." She also described Mr. Agwomoh as "uncooperative" as she and her colleagues attempted to assess his injuries. He "didn't realize what was going on," and he "wanted to leave." As he was being loaded into the ambulance, he tried to get off the stretcher and walk away a couple of times. Ms. Krueger recalled that, when they asked him directly if he had been drinking, his response was "a sarcastic 'yeah.' " The ambulance left

4

for Advocate Christ Medical Center at around 1:15 a.m.

¶ 14 In the telemetry log—the document in which a receiving hospital records the preliminary information it receives from paramedics regarding incoming patients—hospital staff noted that it was unclear whether Mr. Agwomoh had been wearing a seatbelt at the time of the collision, that he had been drinking alcohol, and that he was "combative" but "calming down."

¶ 15 B. Arrival at the Hospital

¶ 16 The ambulance arrived at Advocate Christ Medical Center at 1:26 a.m. The paramedics brought Mr. Agwomoh to a trauma section of the emergency room (ER) and handed him over to the hospital's medical staff. The hospital staff asked the paramedics why Mr. Agwomoh was not "backboarded all the way," and the paramedics responded that he "kept getting up" and that they tried but could not get him to remain on the board. Mr. Agwomoh was placed on a hospital gurney, and the paramedics departed.

¶ 17 Four medical professionals were present in the ER when Mr. Agwomoh arrived, all of whom were later deposed: Valerie Avalos, an ER technician; Jolene Lorenz, a registered nurse assigned to the emergency department that night; Dr. Yalaunda Thomas, a trauma and general surgeon; and Dr. Graeme Twanow, an ER physician who at the time was a second-year resident. According to Ms. Avalos, when Mr. Agwomoh arrived, he was "drowsy" and unable to maintain eye contact or answer the doctors' questions, but he was not in an agitated state. Ms. Avalos removed Mr. Agwomoh's clothes and placed him in a hospital gown. At 1:42 a.m., Dr. Thomas ordered that Mr. Agwomoh be taken to radiology for various computed tomography (CT) tests to rule out potential head injuries.

¶ 18 Officer Perez had followed Mr. Agwomoh to the hospital and was present in the ER while Ms. Avalos and the rest of the trauma team looked him over. At some point before Mr. Agwomoh

was transported to the radiology department, Officer Perez handcuffed him to the gurney, told Ms. Avalos that Mr. Agwomoh was in police custody for a suspected DUI, and explained to her that he would have to stay alongside Mr. Agwomoh as they treated him. Officer Perez also administered the "Warning to Motorists" to Mr. Agwomoh and attempted to obtain his verbal consent for a blood sample. Ms. Avalos witnessed this exchange. According to Ms. Avalos, while Officer Perez was trying to get a yes or no answer regarding a blood sample, Dr. Thomas came in and made it clear that she wanted Mr. Agwomoh to get a CT scan before "any kind of formal DUI" processing took place and that "Officer Perez said he was totally okay with it." Ms. Avalos then began to push Mr. Agwomoh's gurney towards the CT scan room, and Officer Perez followed closely behind. During the walk, which lasted about a minute, Ms. Avalos recalled that Mr. Agwomoh was calm.

¶ 19                    C. The Altercation in the CT Scan Room

¶ 20    Officer Perez uncuffed Mr. Agwomoh in the CT scan room. He then left Mr. Agwomoh and Ms. Avalos alone next to the scanner and stepped into the adjacent viewing room, where he could continue to observe what was going on through a window. Also in the viewing room was a CT technologist named Tariq Elkhatib. Mr. Elkhatib operated the scanner's control panel and, from where he was seated, could see the entire CT scan room. When Mr. Elkhatib first observed Mr. Agwomoh being wheeled into position next to the scanner, he recalled him being "perfectly calm."

¶ 21    The CT machine that the medical staff planned on using was one they often used for pediatric patients. While it was the same size as a typical CT machine, the ring around the tube where the patient enters the machine was painted with monkey faces. Ms. Avalos prepared Mr. Agwomoh for his scan. She was assisted in this task by a CT technician named Thomas O'Donnell.

Mr. O'Donnell described Mr. Agwomoh as calm and quiet when he first arrived for his CT scan. His first impression was that Mr. Agwomoh was a cooperative patient. Ms. Avalos, Mr. Agwomoh, and Mr. O'Donnell were the only people in the CT scan room.

¶ 22     As Ms. Avalos and Mr. O'Donnell attempted to transfer Mr. Agwomoh from the hospital gurney onto the CT scan bed, Mr. Agwomoh appeared to be startled, and his demeanor shifted. He stepped off the gurney and repeatedly asked Ms. Avalos where his clothes were. Ms. Avalos sternly directed Mr. Agwomoh to get back onto the gurney, but he did not comply. He then ripped off his cervical collar and tossed it at the floor. Ms. Avalos recalled that he became "combative" and made it clear to her that he wanted to leave the room.

¶ 23     Ms. Avalos testified that at this point she became concerned about her personal safety. She explained in her deposition that she remembered Mr. O'Donnell calling Officer Perez back into the room to help them deal with Mr. Agwomoh, but she acknowledged that it is possible she was the one who called Officer Perez back in for assistance. According to Officer Perez, Ms. Avalos looked at him at that moment with a "scared look" on her face, a "come help me" look.

¶ 24     Observing Mr. Agwomoh's sudden shift in demeanor from the viewing room, Mr. Elkhatib also recalled feeling fearful for the safety of those around him. He described Mr. Agwomoh as a "really big guy" who was suddenly on his feet, naked, loud, and agitated. Mr. Elkhatib "didn't know what to expect" and "felt helpless." After Mr. Agwomoh tossed his c-collar to the ground, Mr. Elkhatib recalled that he began yelling something about "voodoo magic." According to Mr. Elkhatib, Mr. Agwomoh was "pointing at everybody in the room and saying, I'll put voodoo on you" or "something like that." Other witnesses also recalled Mr. Agwomoh's references to "voodoo" in that moment.

¶ 25     Officer Perez entered the CT scan room in a matter of seconds and ordered Mr. Agwomoh

to get back onto the gurney. According to Officer Perez's own testimony, after Mr. Agwomoh ignored his verbal commands to get back on the cart, he attempted to get handcuffs back on Mr. Agwomoh. Mr. Agwomoh "pulled away" from the officer, at which point Officer Perez threatened to tase Mr. Agwomoh if he did not comply. Mr. Agwomoh did not comply. Officer Perez then discharged his Taser towards Mr. Agwomoh in drive-stun mode. Mr. O'Donnell and Mr. Elkhatib's recollections were similar to Officer Perez's. According to Mr. O'Donnell, "next thing I knew, the officer came in, demanded the patient calm down. The patient didn't calm down. The officer threatened him with a Taser and it went from there." Mr. Elkhatib also testified that Officer Perez first tased Mr. Agwomoh after an initial warning.

¶ 26    Ms. Avalos's testimony differed slightly. While Officer Perez, Mr. Elkhatib, and Mr. O'Donnell all recalled the Taser being deployed after a verbal warning and prior to any significant physical contact between Officer Perez and Mr. Agwomoh, Ms. Avalos claimed in her deposition that, even before using the Taser, Officer Perez was already engaging in a physical struggle with Mr. Agwomoh, which included the officer delivering at least one punch. None of the other witnesses recalled this pre-Taser punch. Another difference is that Ms. Avalos distinctly remembers that Mr. Agwomoh "advanced towards" Officer Perez as soon as the officer reentered the room and ordered him to get back on the cart. She recalled Mr. Agwomoh "fast-paced walking toward [Officer Perez]" in a "confrontational manner."

¶ 27    According to Officer Perez, after drive-stunning Mr. Agwomoh for the first time without success, he gave additional warnings and then drive-stunned him a second time. Then he "backed up, told [Mr. Agwomoh] he was going to be tased, at which point he continued to disregard [Officer Perez's] commands." Officer Perez then discharged his Taser for a third time, but this time instead of using drive-stun mode, he pulled the trigger and fired the cartridge at Mr. Agwomoh. The Taser

prongs landed on Mr. Agwomoh's torso. Officer Perez recalled that upon firing his Taser, Mr. Agwomoh "charged me with his arm out."

¶ 28    After the Taser cartridge was fired, Ms. Avalos recalled Mr. Agwomoh pinning Officer Perez up against the wall and putting his hands in the officer's vest. She further recalled Officer Perez repeatedly telling Mr. Agwomoh "don't do this, don't do this." While pushed up against the wall, Officer Perez punched Mr. Agwomoh in the head several times. Mr. O'Donnell counted between 5 and 10 strikes to Mr. Agwomoh's face and the back of his head. At some point either immediately before or during this physical struggle, Mr. Agwomoh had shed his gown and was now fully naked. This witnesses also noticed that Mr. Agwomoh had urinated on the floor, although it is unclear exactly when that happened.

¶ 29    Mr. Elkhatib, comparing the scene he was witnessing to something out of *The Incredible Hulk*, recalled that Mr. Agwomoh just "would not go down" and seemed "barely affected by the tasing" and the punches. He recalled that soon after Mr. Agwomoh had moved on Officer Perez— which he interpreted as an attempt to grab his Taser—and Officer Perez began punching Mr. Agwomoh in response, the two fell to the ground and ended up in a wrestling match. He speculated that it is possible they slipped on Mr. Agwomoh's urine. Ms. Avalos called security, who arrived shortly after the two hit the floor.

¶ 30    Tom Giusto, a nurse working nearby, heard Ms. Avalos's call for assistance, which he described as "frantic," and he dropped what he was doing to get to the CT scan room. Dr. Twanow, working with another patient elsewhere in the hospital, recalled a nurse coming up to him and telling him, "your patient went berserk in the CT scanner, he tore off his c-collar and attacked the cop." In response, Dr. Twanow ordered the preparation of a sedative and hurried to the CT scan room.

¶ 31 The first hospital security officer to arrive at the room was Andre Walker. The first thing Mr. Walker saw upon entering the CT scan room was Mr. Agwomoh on top of Officer Perez. He recalled that Officer Perez had Mr. Agwomoh in "somewhat of a headlock." Mr. Walker jumped into the fray and put Mr. Agwomoh in an "arm bar" so that Officer Perez could get back on his feet. Mr. Walker and Officer Perez then worked together to get Mr. Agwomoh facedown on the ground and put him in handcuffs. Mr. Walker recalled that for a time, as they tried to regain control of him, Officer Perez had his knee on Mr. Agwomoh's back.

¶ 32 A nurse then injected Mr. Agwomoh in the buttocks with the sedative ordered by Dr. Twanow. After the sedative took effect, Officer Perez and hospital security staff—Mr. Walker and two other security officers who arrived after him—picked Mr. Agwomoh up and put him back on the gurney, where they placed him in restraints. According to Mr. Walker, "the whole sequence," from the moment he entered the room until the moment Mr. Agwomoh was secured, lasted between five and eight minutes. Shortly after Mr. Agwomoh was sedated and put back on the gurney, Dr. Thomas, the attending trauma doctor, arrived. She noticed that Mr. Agwomoh was no longer breathing. The restraints were removed, and medical staff immediately began to perform CPR. The efforts to resuscitate Mr. Agwomoh were unsuccessful, and he was pronounced dead at 2:53 a.m.

¶ 33                         D. The Medical Examiner's Report

¶ 34 On March 11, 2018, the day after Mr. Agwomoh's death, Dr. Jon Gates of the Cook County Medical Examiner's Office issued a postmortem report declaring the manner of Mr. Agwomoh's death to be homicide. In the section of the report describing evidence of injury, Dr. Gates noted multiple blunt force injuries and the presence of the barbs from the Taser, which remained lodged in Mr. Agwomoh's torso. Dr. Gates opined that Mr. Agwomoh died from "hypertensive

arteriosclerotic cardiovascular disease" but that "stress due to physical struggle was a significant contributing condition."

¶ 35    The cause of Mr. Agwomoh's death, Dr. Gates explained, was multifactorial: "[t]he temporal relationship between the physical struggle and the decedent becoming unresponsive indicates interplay between the body's physiologic response to stress and the underlying heart disease identified at autopsy." According to an attached toxicology report, Mr. Agwomoh had a blood alcohol concentration (BAC) of 0.194 grams of alcohol per 100 milliliters of blood, over twice the legal limit for operating a vehicle.

¶ 36                                    E. The Expert Witnesses

¶ 37    John G. Peters, Ph.D., a former law enforcement officer and an expert in use of force policies and Taser safety, was retained by Ms. Agwomoh to render an expert opinion in this case. In his report, Dr. Peters reached four overall conclusions: (1) the Village of Dolton Police Department's training practices on the proper use of Taser guns fell below national standards, as they did not include a "competency-based testing" component, (2) Officer Perez failed to follow either proper Taser usage standards or Dolton Police Department policies when he decided to use his Taser first in drive-stun mode, which is "known to produce no neuromuscular incapacitation," (3) Officer Perez likewise failed to follow proper Taser usage standards when, after unsuccessfully discharging the Taser in drive-stun mode, he fired the Taser cartridge at Mr. Agwomoh's chest area, and (4) Officer Perez's decision not to handcuff Mr. Agwomoh's wrists in front of him prior to the CT scan fell below national handcuffing standards. These four failures, Dr. Peters concluded in his report, "constitute[d] utter indifference to and/or disregard for the decedent."

¶ 38    At his deposition, Dr. Peters answered "yes" when asked if the "manner and sequence" in which Officer Perez used his Taser "needlessly endangered" Mr. Agwomoh. He also explained

11

that the purpose of drive-stun mode is not incapacitation but pain compliance. Drive-stuns, according to Dr. Peters, "seldom calm[ ] a situation," and they are "known in the industry to just make people angry." For this reason, his opinion was that drive-stunning Mr. Agwomoh was exactly the wrong response to the volatile situation Officer Perez found himself in.

¶ 39    Defendants' expert, Robert T. Johnson, was a law enforcement policy and practices consultant and a retired lieutenant colonel from the Illinois State Police who has served as an independent investigator in police misconduct cases. Mr. Johnson disagreed with the conclusions reached by Dr. Peters. Mr. Johnson's overall critique of Dr. Peters's analysis was that Dr. Peters had unfairly examined the incident not from the perspective of a reasonable officer on the scene but rather with "20/20 hindsight." In Mr. Johnson's view, this analytical distance allowed Dr. Peters to minimize the extent to which Officer Perez was forced to make split-second decisions in a situation that was "tense, uncertain, and rapidly evolving."

¶ 40                                    F. Summary Judgment

¶ 41    On March 8, 2021, the circuit court entered summary judgment in favor of Officer Perez and the Village of Dolton. In its written ruling, the court determined that when Officer Perez "entered the CT area and began to engage with the patient, he was providing police protective services to the hospital staff as well as for Mr. Agwomoh himself." Citing *Payne v. City of Chicago*, 2014 IL App (1st) 123010, and *Turner v. City of Champaign*, 970 F.3d 563 (7th Cir. 2020), the court reasoned that this type of protective action was "precisely the type of conduct anticipated by section 4-102" of the Tort Immunity Act (745 ILCS 10/4-102 (West 2020)). Accordingly, the circuit court concluded that these defendants were entitled to summary judgment as a matter of law under section 4-102. The court did no analysis of whether there was a *failure* to provide police protective services or whether any such failure contributed to the alleged wrongful

death of Mr. Agwomoh.

¶ 42    The court found that summary judgment was also warranted under section 2-202 of the Act (*id.* § 2-202) because there was no issue of material fact as to whether Officer Perez's actions rose to the level of willful and wanton. In its ruling, the court chastised Ms. Agwomoh for including in her filings numerous "misleading" factual assertions that, in the court's view, were "entirely unsupported, and often contradicted, by the record."

¶ 43    The court noted that, contrary to Ms. Agwomoh's insinuations, "[n]ot one eyewitness described Perez'[s] actions as excessive or unnecessary." Further,

> "[e]ach member of the medical staff who was present in the immediate area testified in one way or another that they at some time during these events felt fear for their own safety. Each witness testified that [Mr.] Agwomoh was acting in an aggressive manner. It's also instructive that no member of the medical staff themselves attempted to physically control [Mr.] Agwomoh. This was left to Perez and hospital safety personnel once they arrived."

¶ 44    The court concluded that Ms. Agwomoh failed to produce any "evidence that could support a finding that defendant Perez acted unreasonably or with utter indifference to or a conscious disregard of the safety of Mr. Agwomoh." Accordingly, it also found that summary judgment in favor of Officer Perez and the Village of Dolton was appropriate under section 2-202 of the Act.

¶ 45    The circuit court denied Ms. Agwomoh's motion for reconsideration and made a finding that there was no just reason to delay the enforcement or appeal of its order under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016). This appeal followed.

¶ 46                                    II. JURISDICTION

¶ 47    The circuit court denied Ms. Agwomoh's motion to reconsider and entered its Rule 304(a) finding on July 29, 2021. Ms. Agwomoh timely filed her notice of appeal on August 2, 2021. We

have jurisdiction pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), governing appeals from final judgments as to one or more but fewer than all the parties.

¶ 48                                    III. ANALYSIS

¶ 49     As our code of civil procedure makes clear, "[s]ummary judgment is proper when 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Bremer v. City of Rockford*, 2016 IL 119889, ¶ 20 (quoting 735 ILCS 5/2-1005(c) (West 2008)). "The purpose of summary judgment is not to try an issue of fact but to determine whether one exists." *Monson v. City of Danville*, 2018 IL 122486, ¶ 12. "A genuine issue of material fact precluding summary judgment exists where the material facts are disputed, or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts." (Internal quotation marks omitted.) *Id.* "In ruling on a motion for summary judgment, we must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent." *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 22. We review a grant of summary judgment *de novo*. *Id.*

¶ 50     As our supreme court explained in *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967), where questions of fact are involved, a court may only grant summary judgment as a matter of law if the evidence, when viewed in the light most favorable to the nonmovant, so overwhelmingly favors the movant that "no contrary verdict based on that evidence could ever stand."

¶ 51     This appeal implicates two separate provisions of the Tort Immunity Act: section 4-102 and section 2-202.

¶ 52     Section 4-102 of the Act, titled "Police protection," reads, in relevant part, as follows:

"Neither a local public entity nor a public employee is liable for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide adequate police protection or service, failure to prevent the commission of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals." 745 ILCS 10/4-102 (West 2020).

¶ 53      Section 2-202 of the Act, titled "Execution or enforcement of law," reads, "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." *Id.* § 2-202.

¶ 54      On appeal, Ms. Agwomoh argues that the circuit court erred in granting summary judgment in favor of Officer Perez and the Village of Dolton because questions of fact preclude summary judgment under both of these immunity provisions. Section 4-102 was misapplied, Ms. Agwomoh argues, because, as the statutory text makes clear, that provision grants absolute immunity only where there has been a "*failure* to provide adequate police protection or service" (emphasis in original), which she maintains is not what she has alleged caused the death of her father. She also argues that summary judgment was improperly granted pursuant to section 2-202 because "minimally, the record demonstrates the existence of genuine issues of material fact for a jury's resolution" on the question of whether Officer Perez's treatment of Mr. Agwomoh amounted to willful and wanton misconduct. We address each of Ms. Agwomoh's arguments in turn.

¶ 55                    A. Absolute Immunity Under Section 4-102

¶ 56      Our supreme court has referred to section 4-102 of the Act as a codification of the "common law blanket immunity *** which immunizes a municipality and its employees for the failure to provide police protection." *Aikens v. Morris*, 145 Ill. 2d 273, 282 (1991). Appellate court panels have applied section 4-102 to immunize police officers from civil suit where they are performing

some function other than traditional law enforcement. For example, Illinois courts have granted absolute immunity under section 4-102 in cases where police officers were providing aid, assistance, or rescue services to stranded drivers and vehicles involved in traffic accidents (*Long v. Soderquist*, 126 Ill. App. 3d 1059 (1984); *Kavanaugh v. Midwest Club, Inc.*, 164 Ill. App. 3d 213 (1987)) and in cases where law enforcement failed to respond after receiving a call to assist a motorist who had driven off the road (*DeSmet v. County of Rock Island*, 219 Ill. 2d 497 (2006)). Section 4-102 may also apply where a police officer fails to perform a "community caretaking" function (*id.* at 520), something our supreme court has defined in other contexts as the "capacity in which the police act when they are performing some task unrelated to the investigation of crime, such as helping children find their parents, mediating noise disputes, responding to calls about missing persons or sick neighbors, or helping inebriates find their way home." *People v. McDonough*, 239 Ill. 2d 260, 269 (2010).

¶ 57    The circuit court in this case found that, as a matter of law or undisputed fact, "[o]nce Perez entered the CT area and began to engage with the patient, he was providing police protective services to the hospital staff as well as for Mr. Agwomoh himself." This type of protective action, the court reasoned, was "precisely the type of conduct anticipated by section 4-102." The Village of Dolton and Officer Perez argue the circuit court's application of section 4-102 was correct, and like the circuit court, they rely on this court's decision in *Payne* and the Seventh Circuit's decision in *Turner* as analogous cases where police were summoned to protect citizens who were having mental health crises and failed to prevent those citizens from injuring themselves.

¶ 58    We do not find *Payne* and *Turner* to be applicable in this context, however, as this case involves an entirely different type of police-citizen interaction. Here, Officer Perez was present at the hospital not to provide support to someone having a mental health crisis but because Mr.

16

Agwomoh was under arrest, and Officer Perez had been ordered to follow him to the hospital for the purpose of continuing a DUI investigation. In our view, the fact that Mr. Agwomoh was in police custody on a criminal matter at the time of his injury makes this case categorically different from *Payne* and *Turner*.

¶ 59    Here, there is an abundance of evidence that Officer Perez was present at the hospital to keep watch over his detainee. As Ms. Avalos's testimony suggests (see *supra* ¶ 18), Officer Perez was waiting for Mr. Agwomoh's medical needs to be addressed so that he could proceed to collect evidence and complete his arrest for the suspected DUI. From his perspective, the CT scans ordered by Dr. Thomas were a prerequisite to him performing these actions. Thus, a reasonable fact-finder could conclude that Officer Perez was not providing police protection services.

¶ 60    In addition, as Ms. Agwomoh argues, under the plain language of section 4-102, an officer is not liable "for *failure* to provide adequate police protection or service." (Emphasis added.) 745 ILCS 10/4-102 (West 2020). Thus, even if we were to accept the circuit court's finding that Officer Perez was engaged in police protection services at the time of Mr. Agwomoh's death, it remains unclear to us what exactly those police protection services were, whether there was a *failure* in the provision of those services, and whether that failure ultimately caused Mr. Agwomoh's death. Summary judgment should not have been granted to the defendants for these additional reasons.

¶ 61    As Ms. Agwomoh did not file a cross motion for summary judgment on this 4-102 defense, we need not decide whether, based on this record, the immunity provision is inapplicable as a matter of law. The parties can litigate that issue on remand. In either event, summary judgment should not have been entered in favor of the defendants pursuant to section 4-102.

¶ 62                      B. Qualified Immunity Under Section 2-202

¶ 63    To the extent that he was not engaged in police protection services, Officer Perez was

unquestionably engaged in the "execution or enforcement" of the law when his fatal altercation with Mr. Agwomoh occurred. This placed him squarely in the realm of section 2-202. Pursuant to that section, he and the Village are entitled to immunity unless the officer's conduct was "willful and wanton." This is defined elsewhere in the Act as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." *Id.* § 1-210.

¶ 64    As our supreme court explained in *Ziarko v. Soo Line R.R. Co.*, 161 Ill. 2d 267, 274 (1994), "[t]here is no separate and independent tort of 'willful and wanton' misconduct." Instead, willful and wanton misconduct is essentially an aggravated form of negligence: "a hybrid between conduct considered negligent and conduct considered intentionally tortious." *Sparks v. Starks*, 367 Ill. App. 3d 834, 837 (2006); see also *Romito v. City of Chicago*, 2019 IL App (1st) 181152, ¶ 30 ("[a] qualitative difference necessarily exists between willful and wanton misconduct and ordinary negligence; willful and wanton misconduct should shock the conscience").

¶ 65    Determining whether a public employee's actions amount to willful and wanton conduct is normally a question of fact to be resolved by a jury, but a court may hold as a matter of law that the employee's actions did not amount to willful and wanton conduct where no other contrary conclusion can be drawn from the record presented. *Williams v. City of Evanston*, 378 Ill. App. 3d 590, 597 (2007). In this case, the circuit court drew that conclusion and granted summary judgment in favor of Officer Perez and the Village of Dolton pursuant to section 2-202 after determining that Ms. Agwomoh "ha[d] produced no evidence that could support a finding that defendant [Officer] Perez acted unreasonably or with utter indifference to or a conscious disregard of the safety of Mr. Agwomoh." We disagree.

¶ 66    When Mr. Agwomoh was transported to the CT scan room, he was disoriented, possibly

18

suffering from a head injury, and presumably drunk. Officer Perez was aware of Mr. Agwomoh's compromised state, as he had observed the severe damage to Mr. Agwomoh's car in the traffic accident, and the reason he had accompanied Mr. Agwomoh to the hospital was to obtain a blood sample as evidence in a drunk driving investigation. Mr. Agwomoh stood up from the gurney, demanded his clothes, tossed his c-collar to the floor, and expressed his desire to leave the room. He then started waving his arms around and shouting about voodoo. As the photographs of the CT scan room show, the CT machine Mr. Agwomoh was being loaded into had monkey faces painted all over it, which might explain the fact that he was referring to "voodoo."

¶ 67    When Officer Perez reentered the CT scan room, he would have observed that no effort had yet been made to calm Mr. Agwomoh down or explain to him what was going on. As he testified, he gave Mr. Agwomoh verbal commands to get back onto the cart. When those commands were "disregarded," he attempted to handcuff Mr. Agwomoh, who pulled away from him. Then, after warning him that he would be tased if he did not comply, Officer Perez deployed his Taser twice in drive-stun mode. At some point, although it is unclear when, Mr. Agwomoh urinated on the floor.

¶ 68    As Dr. Peters explained in his report and subsequent deposition, the use of a Taser in drive-stun mode "seldom calms a situation," and they are "known in the industry to just make people angry." The fact that Officer Perez twice used his Taser in drive-stun mode on Mr. Agwomoh, whose only noncompliance up to that moment was a refusal to get back on a gurney so that he could receive medical care and who, according to all the witnesses, had been perfectly calm just moments earlier, could support a finding that Officer Perez acted willfully and wantonly.

¶ 69    While we do not address them here, there may well have been other actions by Officer Perez that could also support such a finding. Counsel for Ms. Agwomoh suggested at oral argument

that Officer Perez committed nine distinct acts that could each support a finding of willful and wanton conduct. While we failed to see nine distinct acts in her recitation, in focusing our analysis on Officer Perez's use of his Taser in drive-stun mode, we do not mean to suggest that this was the only possible act committed by Officer Perez that morning that could support a finding of willful and wanton conduct.

¶ 70    We also note that, at oral argument, counsel for defendants asserted that Officer Perez did not use his Taser until after Mr. Agwomoh advanced on him. When questioned on this point by the court, counsel declared that this was undisputed by the witnesses. But we have closely reviewed the deposition testimony, and of the four surviving witnesses to the altercation, only Ms. Avalos testified that Mr. Agwomoh "advanced on" Officer Perez prior to his use of the Taser. The three other witnesses—Mr. O'Donnell, Mr. Elkhatib, and Officer Perez himself—testified that Mr. Agwomoh was tased before he had advanced on anyone. Thus, contrary to defense counsel's characterizations of the evidence, in our view, there were genuine issues of material fact related to the sequence of events and when exactly Officer Perez chose to deploy his taser.

¶ 71    Finally, both the circuit court and the defendants highlight the fact that not one of the eyewitnesses described Officer Perez's actions as excessive or unnecessary, but the three witnesses who observed the use of the Taser—Ms. Avalos, Mr. O'Donnell, and Mr. Elkhatib—were medical professionals, not individuals with expertise in police use of force procedures. As such, they would have no reason to recognize whether Officer Perez's actions, and the specific way in which he used his Taser device, demonstrated conscious disregard for Mr. Agwomoh's welfare and safety.

¶ 72    We are not unsympathetic to the points made by the defendants' expert witness Robert T. Johnson. We fully appreciate that police officers have a difficult job and that they often find themselves in "tense, uncertain, and rapidly evolving situations" where they must make split-

second decisions using "well-reasoned discretion." However, as we stated in *Suwanski v. Village of Lombard*, 342 Ill. App. 3d 248, 259 (2003), "[w]hile we agree that police officers should be able to perform their duties as free as possible from liability concerns, there must be some reasonable limit to their exercise of discretion." In cases like this one, where reasonable minds might draw different inferences from the same undisputed facts, it is the role of the jury to decide whether Officer Perez's exercise of discretion crossed a line and exhibited an utter indifference to or conscious disregard for the safety of Mr. Agwomoh.

¶ 73    Viewing the evidence in the light most favorable to Ms. Agwomoh, we find that under the specific facts of this case there exists a jury question sufficient to preclude summary judgment on the issue of whether Officer Perez engaged in willful and wanton conduct in the moments leading up to Mr. Agwomoh's death.

¶ 74                                   IV. CONCLUSION

¶ 75    For the foregoing reasons, we reverse and remand this case for further proceedings in accordance with this opinion.

¶ 76    Reversed and remanded.

---

*Agwomoh v. Village of Dolton*, **2022 IL App (1st) 210892**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-L-2677; the Hon. Lorna E. Propes, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Robert J. Napleton and Cameron J. Botticelli, of Motherway & Napleton, LLP, of Chicago, and Lynn D. Dowd, of Naperville, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | ShawnTe Raines and Jeffrey C. Grossich, of Ancel Glink, P.C., of Chicago, for appellees. |

---